UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

-------------------------------------------------------------X

ENVIRONMENTAL PRODUCTS CORP.         :
                                     :
                          Plaintiff, :
                                     :        Case No. _____
            - against -              :
                                     :
                                     :
TOMRA OF NORTH AMERICA, INC.,        :
TOMRA SYSTEMS ASA                    :
                                     :        **JURY TRIAL DEMANDED**
                                     :        **COMPLAINT**
                          Defendants.  :
-------------------------------------------------------------X

Plaintiff Environmental Products Corp. ("Envipco"), by its attorneys Axinn, Veltrop &

Harkrider LLP, for its complaint against Defendants Tomra of North America Inc. and Tomra

Systems ASA, (collectively "Tomra"), alleges upon knowledge with respect to its own acts, and

upon information and belief as to other matters, as follows:

## NATURE OF THE ACTION

1.  In this action, Plaintiff seeks compensatory, punitive and treble damages from

Defendants for their anticompetitive, unfair and deceptive practices, which violate the antitrust

laws and state unfair trade practice acts.  In addition, Plaintiff seeks to enjoin Defendants'

anticompetitive, unfair and deceptive practices as alleged herein so that consumers can reap the

benefits of a competitive marketplace.

2.  As set forth in this Complaint, Tomra's anticompetitive, monopolistic and deceptive

practices are part of a company-wide policy of foreclosing market entry and eliminating

competitors.  As part of its scheme to unfairly and unlawfully eliminate competition and

dominate the market for Reverse Vending Machine Systems, Tomra has: (i) used and

manipulated exclusive dealing arrangements with important customers, foreclosing competitors from those critical relationships; (ii) entered into joint ventures with key participants in the relevant markets, thereby denying competitors the ability to compete on a level playing field; and (iii) engaged in deceptive billing practices and other misleading conduct to persuade customers to deal exclusively with Tomra. In addition, Envipco has reason to believe that Tomra has entered into negotiations to acquire a RVM firm that has monopoly power in Oregon and is a potential competitor elsewhere in the United States.

3. Tomra's unfair, anticompetitive and deceptive practices, when viewed individually or collectively, serve no purpose except to insulate Tomra from competition to the detriment of the consumers of Reverse Vending Machine Systems and Tomra's competition, Envipco.

4. Tomra engaged in similar anticompetitive conduct in Europe. To penalize Tomra for its violation of European antitrust law, the European Union issued one of the highest fines ever imposed on a company for violating the antitrust laws. Tomra's monopolistic behavior in the United States, however, remains undiminished and undeterred.

## PARTIES

5. Plaintiff Environmental Products Corp. is a wholly owned subsidiary of Envipco Holding N.V. with headquarters located in Naugatuck, Connecticut. Envipco manufactures and sells or leases reverse vending machines ("RVMs") in interstate commerce and within the States of Connecticut, New York, Massachusetts and Michigan. Envipco's annual revenues for 2009 sales and leases of RVMs, and related services, in the United States was over $20 million.

6. Defendant Tomra of North America, Inc. is a Delaware corporation with offices located at One Corporate Drive, Suite 710, Shelton, Connecticut 06484. It is a wholly owned subsidiary of Tomra Systems ASA. Tomra of North America purchases RVMs that are manufactured by

2

Tomra Systems ASA and then sells or leases those RVMs in interstate commerce and within the States of Connecticut, New York, Massachusetts and Michigan. On information and belief, Tomra of North America's annual revenues for 2009 sales and leases of RVMs, and related services, in the United States was over $100 million.

7. Defendant Tomra Systems ASA is the Norwegian parent company of Tomra of North America. Tomra Systems ASA manufacturers RVMs, which it sells to Tomra of North America and delivers to Tomra of North America's warehouse in Connecticut.

8. Tomra Systems ASA also exercises control over Tomra of North America's operations. Tomra Systems ASA, for example, approves Tomra of North America's business plans and budgets. In addition, the companies share executives. Michael Liess, for example, is a member of Tomra Systems ASA's Group Management team and serves as the President and CEO of Tomra of North America.

## JURISDICTION AND VENUE

9. This action is brought pursuant to Sections 3, 4, 12 and 16 of the Clayton Act, 15 U.S.C. §§ 14, 15, 22 and 26 and Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. Pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15, Plaintiff seeks trebled money for damages resulting from Defendants' antitrust violations, as well as other relief. Pursuant to Section 16 of the Clayton Act, 15 U.S.C. § 26, Plaintiff seeks permanent injunctive relief to prevent further injury and to prevent the continuation of such violations. Plaintiff also seeks damages and injunctive relief under the State unfair trade practice acts and/or antitrust acts of Connecticut, New York, Massachusetts, and Michigan.

10. This Court has jurisdiction over the subject matter of the federal claims pursuant to 28 U.S.C. §§ 1331 and 1337 and 15 U.S.C. §§ 15 and 26 because this case arises under the antitrust laws of the United States.

11. This Court has supplemental jurisdiction over the related state law claims pursuant to 28 U.S.C. § 1367.

12. Jurisdiction over the Defendants is proper in this Court pursuant to 15 U.S.C. §§ 15 and 22.

13. Venue in this Court is proper pursuant to 15 U.S.C. § 22 and 28 U.S.C. §§ 1391 because Tomra of North America has its headquarters in Shelton, Connecticut and because both Defendants transact business in this forum.

## BACKGROUND

14. To encourage the recycling of beverage containers, several states have passed container deposit legislation (commonly referred to as "bottle bills"). Bottle bills typically require consumers to pay a small deposit, usually 5 or 10 cents, at the time they purchase a beverage and then provide for the consumer to receive a refund of the deposit when the consumer returns the empty or used beverage container.

15. Bottle bills provide two principal mechanisms for consumers to receive a refund of their deposit. Some states, such as California, establish redemption centers where the consumer can return the container and receive a refund. In other states, the statute allows consumers to return their empty containers and receive a deposit refund at any retailer that sells beverage containers.

16. The states that allow consumers to return their beverage container to a retailer are Connecticut, Iowa, Maine, Massachusetts, Michigan, New York, Oregon and Vermont. In these States, consumers are not required to return their beverage containers to the same retailer that

sold them the containers. Rather, retailers are required to refund the deposit for any container that is for a brand the retailer carries. The retailer can then seek reimbursement of the deposit from the beverage manufacturer.

17. In many bottle bill states that provide for redemption at the retailer, the beverage manufacturer is statutorily obligated to pay a handling fee to the retailer for each of the manufacturer's containers that the retailer redeems. The handling fee can range from 1.5 cents to 3.5 cents per container, depending on the state and type of container.

18. In a bottle bill state that has a 5 cent deposit fee and allows redemption at retail stores, for example, the beverage manufacturer (e.g. Coca-Cola) charges the retailer an extra 5 cents for every container the retailer purchases (the "deposit initiation fee"). The retailer then recoups this 5 cents from the consumer by charging the consumer a 5 cent deposit fee at the time of sale. When the consumer returns the empty container to a retailer, the retailer must refund the 5 cents to the consumer even if the consumer did not purchase the container at that retail outlet. Upon reimbursing the consumer's 5 cent deposit, the retailer can seek reimbursement of that 5 cents from the manufacturer, who still holds the original deposit initiation fee. In addition, if the state's statute provides for a 3.5 cent handling fee, the retailer will receive that 3.5 cents from the manufacturer for each container the retailer redeems.

19. Collecting, sorting and storing empty beverage containers, and accurately accounting for the deposit fee associated with each container is a significant undertaking, particularly for large retailers such as supermarkets that carry dozens of beverage brands and are, therefore, often the destination of choice for consumers returning multiple beverage brand containers. Reverse vending machines ("RVMs") were developed to address these sorting, storage and accounting complexities.

20. A RVM provides an automated process for recycling beverage containers by accepting used or empty containers from customers and returning money to the customers.

21. In states that have enacted bottle bills requiring retailers to accept used containers, an RVM must be able to do more than accept containers and refund the deposit fee. The RVM must: (i) accept containers directly from consumers; (ii) account for each container processed, through the use of certain parameters such as shape and/or bar code; (iii) calculate the amount of deposit to be refunded to the consumer; and (iv) enable the retailer to report back to each manufacturer the number of its containers that were returned.

22. For large grocers and supermarkets in bottle bill states, RVMs are essential. The alternative to a RVM is to manually collect every beverage container and manually return every deposit fee. In addition, the retailer would have to establish a method for sorting all of the containers for purposes of seeking refunds of the deposit initiation fee from the appropriate manufacturer. Finally, the retailer would have to establish a system that would address the potential for fraud in a manual system (e.g. ensuring that containers are not double counted).

23. For a retailer in a bottle bill state to use a RVM in its store, the RVM must be approved by the beverage manufacturer. Beverage manufacturers will only approve RVMs that have sufficient functionality and quality control to permit accurate accounting and to prevent fraud.

24. After a retailer has redeemed a used beverage container, the manufacturer of that container typically has responsibility for picking up the container from the retailer. The manufacturer, however, does not have responsibility for picking up the containers associated with other manufacturers. To effectuate this, the retailer would have to sort all of the used containers it redeems so that each manufacturer could collect only its containers. For most retailers, this is not practical, particularly where an RVM is in place since all of the containers in

a RVM are co-mingled. Thus, in addition to having the functionality necessary to be approved by the beverage manufacturer, the RVM firm is typically responsible for arranging for the pick-up of the used beverage containers that are co-mingled in its machines.

25. The collection of used beverage containers is an important, high-profile service for the retailer because poor pick-up service results in used containers piling up at the retailer, creating unsanitary conditions. A retailer is not likely to use a RVM firm if the RVM firm cannot guarantee timely and competent container pick-up service. Thus, to effectively compete, a RVM manufacturer must have an established pick-up infrastructure.

26. It is costly to collect and transport recycled beverage containers long distances. To establish and maintain an efficient pick-up infrastructure, a RVM firm must have a large and concentrated customer base and collection route, which requires a contract with at least one, if not more, of the large supermarket chains in every state where the RVM firm competes. Envipco, for example, was forced to exit the Michigan market after Tomra entered into exclusive, long-term contracts with every major supermarket chain in that State.

## THE RELEVANT MARKETS

27. The relevant product market affected by Defendants' anticompetitive conduct is the market for RVMs that have the sorting, accounting, fraud prevention and back-end billing functionality necessary to be approved for use in bottle bill states ("RVM Systems").

28. For RVM System consumers, other products and services, including RVMs used in non-bottle bill states and the manual provision of beverage container refunds, are not reasonably interchangeable with RVM Systems.

29. RVMs used in non-bottle bill states do not offer the sorting, accounting, fraud prevention and back-end billing functionality necessary to be approved by the beverage manufacturers and,

thus, are not an option for retailers in bottle bill states. An RVM in a non-bottle bill state, for example, would not be able to accurately distinguish between a Coke can and a Pepsi can so that the retailer could seek a deposit refund from the appropriate manufacturer.

30. Manually collecting every empty beverage container and manually returning every deposit is significantly more costly and time-consuming to implement than placing a RVM System in the store. Moreover, RVM Systems alleviate the sanitation problem associated with manually sorting and storing empty beverage containers. And, RVM Systems offer convenience to customers, which helps build customer loyalty for the retail outlet. As a result, a retailer would not view the manual handling of recycled beverage containers as a substitute for a RVM System.

31. The relevant geographic markets affected by Defendants' conduct are the States of Connecticut, New York, Massachusetts and Michigan. In the alternative, the relevant geographic market is the continental United States.

32. Each bottle bill state constitutes a separate market because each state's law has different criteria. In addition, it is important for a RVM System firm to have: (i) technicians available to fix machines within approximately eight hours from the time of a complaint; (ii) nearby warehouses with spare parts, and (iii) a dense pick-up route for the removal of redeemed containers. Thus, an RVM System firm in one state could not quickly or easily enter a different state.

33. Alternatively, the relevant geographic market is the continental United States. Because the relevant product – RVM Systems – are principally sold in states whose bottle bills necessitate their usage, the relevant geographic market would effectively include only the states of Connecticut, Iowa, Maine, Massachusetts, Michigan, New York, Oregon and Vermont.

8

## BARRIERS TO ENTRY

34. Barriers to entry into the relevant market are exceedingly high. As such, entry into the RVM Systems market is unlikely to occur in a manner sufficient to defeat the anticompetitive effects of Defendants' unlawful conduct.

35. A manufacturer of a RVM used in a non-bottle bill state could not easily or quickly expand into the market for RVM Systems because there are significant barriers to entering the RVM Systems market, including: (i) the significant investment of time and money to develop the functionality necessary for approval by beverage manufacturers for use in bottle bill states; (ii) the existence of patents covering current RVM System technology that a new entrant would have to design around; (iii) the importance of developing a reputation for having a reliable RVM System; (iv) the need to develop an efficient pick-up infrastructure; and (v) the need to overcome the additional barriers to entry created by Defendants' anticompetitive conduct, as alleged herein, including Defendants' use of long-term, exclusive contracts with large supermarkets, which make it exceedingly difficult for any firm to develop the economies of scale and density of pick-up, service and maintenance routes necessary to compete in the RVM System market.

## TOMRA'S MARKET POWER

36. Tomra and Envipco are the only significant competitors in the market for RVM Systems in the United States.

37. Tomra has a 77% market share in Connecticut.

38. Tomra has a 76% market share in New York.

39. Tomra has a 63% market share in Massachusetts.

40. Tomra has an 87% market share in Michigan.

9

41. Tomra has a 70% market share in the United States. On information and belief, Tomra recently entered into negotiations to acquire Can & Bottle Systems, Inc ("CBSI"), which sells RVM Systems in Oregon and Michigan. If successful, that acquisition will increase Tomra's market share in the United States to approximately 77%.

42. Tomra has a 79% share of sales to the large supermarket chains that are essential for developing the economies of scale and density of pick-up, service and maintenance routes necessary to compete in the relevant market(s).

43. Tomra has and exercises monopoly power in the relevant market(s).

44. Tomra has the power to control prices and/or exclude competition in, or prevent entry into, the relevant market(s).

## TOMRA'S ANTICOMPETITIVE CONDUCT

45. Tomra has acquired and maintained its monopoly position in the relevant market(s) through unfair, exclusionary and anticompetitive means.

46. To effectively compete in the RVM Systems market in the United States, it is essential to have a substantial presence in Connecticut, New York, Massachusetts and Michigan.

47. Outside of Connecticut, New York, Massachusetts and Michigan, there are very few RVM System opportunities. Only four other states have bottle bills that provide for redemption at the retailer – Iowa, Maine, Vermont and Oregon. Three of those states – Iowa, Maine and Vermont – collectively account for approximately 6% of the RVM System market. In the fourth state, Oregon, the bottle bill is administered by the Oregon Beverage Recycling Cooperative ("OBRC"), a cooperative of Oregon beverage distributors.

48. OBRC has an exclusive contract to purchase RVM Systems from CBSI. Although retailers in Oregon can theoretically purchase a RVM System from a competitor of CBSI, as a

10

practical matter almost all retailers lease their RVM Systems through OBRC because OBRC
subsidizes the price of CBSI's product. Safeway, for example, which is Oregon's largest
supermarket chain, has an exclusive agreement to purchase its RVM Systems through OBRC.
OBRC's policy of subsidizing CBSI's product has precluded competitors from effectively
competing in Oregon and has resulted in CBSI attaining a 92% share of the Oregon RVM
System market and a 7% share of the U.S. RVM System market.

49. If it acquires CBSI, Tomra will obtain a monopoly in the RVM System market in Oregon
and increase its monopoly power in the United States. Moreover, because an experienced RVM
System firm such as CBSI, with a large installed base in Oregon and significant sales in
Michigan, would likely have been a viable RVM System competitor in the other bottle bill states,
including Connecticut, New York, and Massachusetts, Tomra's acquisition of CBSI will
eliminate its most significant potential competitor in each of those States.

50. By foreclosing actual competitors such as Envipco from a substantial share of the RVM
System opportunities in Connecticut, New York, Massachusetts and Michigan, Tomra has
effectively foreclosed competition in each of those States and in the United States. Moreover,
Tomra's foreclosure strategy will be furthered if it acquires CBSI, the most promising source of
potential competition.

51. In Connecticut, New York, Massachusetts and Michigan, there are 20 supermarket chains
that account for the majority of RVM System purchases. Without an ability to compete for the
business of these supermarket chains, an RVM System manufacturer cannot effectively compete
in each of these States individually, or in the United States overall, because it cannot achieve the
economies of scale or density of pick-up, service and maintenance routes essential to being an
efficient competitor.

11

52. Tomra has entered into long-term, exclusive contracts with 12 of the 20 large supermarket chains in Connecticut, New York, Massachusetts, and Michigan. These 12 contracts foreclose 55% of the RVM System opportunities at large supermarket chains.

53. Tomra has also entered into a minimum purchase agreement with an additional large supermarket chain that operates in New York and Massachusetts and that accounts for 6% of the large supermarket RVM System opportunities. This agreement, in conjunction with Tomra's other exclusive agreements, has foreclosed RVM System competitors from 61% of large supermarket opportunities.

54. As a result of Tomra's large installed base of RVM Systems, its exclusive agreements with the majority of large supermarket chains, which prohibit the supermarkets from using an RVM System manufactured by a firm other than Tomra, and its use of minimum purchase requirements, RVM System competitors are foreclosed from a substantial share of the relevant market.

55. Recently, Tomra proposed a six year exclusive contract with a supermarket chain in Michigan. If accepted, this contract would foreclose an additional 7% of the large supermarket chain opportunities, leading to a total foreclosure of 68% of large supermarket chains overall and a 100% foreclosure of large supermarket chains in Michigan.

56. The exclusive contracts between Tomra and its large supermarket customers typically last five or six years and are not easily terminated. Moreover, Tomra has foreclosed competitors from the opportunity to compete for the long term contracts of large supermarkets by leveraging its large installed base of RVM Systems to offer rebates to customers on the RVM Systems currently in their stores in exchange for an early extension of their Tomra contract. For example, in 2008, Envipco had several high level meetings with a large supermarket chain located in New

12

York. The meetings resulted in an oral commitment by the supermarket to test 10 Envipco RVM

Systems and, if the tests were successful, the possibility for Envipco to have a significant

presence in the chain as a second vendor. In addition, Envipco made a very aggressive proposal

for the chain's entire business once Tomra's contract expired in 2009. Envipco's offer was

described as "impressive," by the supermarket chain's procurement manager. Shortly after

making this impressive offer, Envipco learned that it would not win the customer's account

because Tomra had offered upfront cash payments in exchange for an early renewal of its

contract. Envipco was also told that it could not move forward with the 10 store placement test

because the Tomra contract would be exclusive, chain-wide and would cover future locations.

This supermarket chain represented 10% of large supermarket RVM System opportunities.

57. An equally efficient competitor can not compete against Tomra's discounts because

Tomra is able to spread its discount over the customer's future RVM System purchases plus its

current installed base of Tomra RVM Systems. A competitor, by comparison, can only spread

the discount over the future RVM System contract. Thus, Tomra is able to leverage its current

exclusive agreements to create an additional competitive advantage and induce its customers to

prematurely refresh their existing Tomra contracts.

58. The practice of offering rebates on a customer's current contract on the condition that the

customer agree to a future, exclusive long-term contract with Tomra, has the effect of converting

Tomra's contracts into evergreen contracts and of artificially raising the price of switching to a

competitor's RVM System.

59. Because Tomra has locked-up a majority of the large supermarket chains with long-term

contracts, competitors are not able to take advantage of economies of scale in their production

process and are not able to obtain the density of pick-up, service and maintenance routes necessary to effectively compete.

60. The discounts on already installed RVM Systems and the long-term exclusive contracts serve no business purpose other than to exclude Envipco, Tomra's most significant competitor, from the market, and eventually to bring about its exit from the market, thereby leaving Tomra with a complete monopoly in the RVM Systems market.

61. If Tomra's exclusionary conduct causes Envipco to exit the market, there will be no effective restraint on Tomra's ability to raise prices.

62. In addition to entering into exclusive long-term contracts, and/or minimum purchase agreements with the large supermarket chains in the relevant market(s), Tomra has engaged in a variety of other anticompetitive activities to attain and maintain its monopoly position.

63. In New York, along with other states, the beverage distributor ordinarily has the ultimate responsibility for arranging for the pick-up of used beverage containers that are returned by customers to the retail outlets. In practice, however, where an RVM System is in place, which causes the used containers to be co-mingled, the RVM System firm is responsible for the provision of pick-up service and it receives a fee from each of the manufacturers whose containers are accepted by the RVM System.

64. Being able to provide the container pick-up service is essential to compete in the relevant market because the pick-up service is a high priority for the retailers and a retailer is much less likely to retain a RVM System firm if that firm cannot assure the retailer that the used containers redeemed at the store will be picked-up in a timely and competent manner. In addition, the pick-up service provider has regular contact with the retailer and, thus, by providing pick-up service, the RVM System firm is able to solidify its relationship with the retailer.

14

65. As part of its anticompetitive efforts to foreclose Envipco, and any other competitor, from the RVM System market, Tomra has entered into equity based partnerships with beverage manufacturers in upstate New York that provide for Tomra to pick-up redeemed beverage containers from the retail outlets in that area.

66. Envipco is not authorized to pick-up containers in any area covered by the Tomra joint venture because the beverage manufacturers will not approve Envipco to provide the pick-up service due to their joint venture relationship with Tomra.

67. When a retailer in upstate New York expresses an interest in an Envipco RVM System and asks Envipco to assume the pick-up responsibilities, Envipco has to inform the retailer that it cannot provide pick-up service and, instead, Envipco must provide the retailer with Tomra's contact information to arrange for pick-up.

68. Retail owners in upstate New York are deterred from switching to Envipco's RVM System because they have been led to believe that their pick-up service will be negatively affected if Tomra is not their RVM System provider. This concern was legitimized when an independent retailer did agree to use Envipco's RVM System and immediately suffered delays and disruptions to its normal pick-up service.

69. Envipco has been told by multiple customers that they would switch from Tomra's RVM System to Envipco's RVM System if Envipco could be their pick-up agent. Thus, in upstate New York, not only must Envipco make a better offer on its RVM System, but its offer must be sufficiently superior that a customer would undergo the expense and disruption caused by poor pick-up service in order to use Envipco's RVM System instead of Tomra's RVM System.

70. In Michigan, Tomra formed a pick-up joint venture with Schupan Recycling, the largest redemption commodity recycler in the State. The joint venture obtained a ten-year exclusive

contract for all large volume RVM pickups with the two beverage associations whose members include all major beverage distributors covered by Michigan's bottle bill. The joint venture ("UBCR") developed a commodity storage container (the "UBCR bin") that all retailers are required to have at their stores. Tomra then introduced an RVM System that was customized to sit on top of the UBCR bin. This customized RVM System enabled Tomra to obtain exclusive contracts at the three large supermarket chains in Michigan.

71. As a result of Tomra's exclusive agreements with all of the large supermarket chains in Michigan, Envipco significantly reduced its sales efforts in Michigan from 2004 until 2007.

72. CBSI has developed a RVM System that can fit on top of the UBCR bin.

73. Likewise, Envipco recently reestablished a sales and marketing presence in Michigan with a RVM System that can fit on top of the UBCR bin.

74. Tomra's contract with one of the major supermarket chains in Michigan will expire soon and the supermarket solicited bids from CBSI, Envipco and Tomra for its business.

75. CBSI's RVM System was ultimately deemed to have insufficient compaction for use in the supermarket's stores. Improving the compaction on a RVM System, however, is a relatively easy modification and one that CBSI could likely have accomplished. As such, CBSI represented a significant threat to Tomra's dominance in Michigan. By negotiating to acquire CBSI, Tomra seeks to eliminate this competitive threat.

76. On information and belief, Envipco's bid for the Michigan supermarket's business was superior to Tomra's bid. Tomra, however, leveraged the exclusive agreements it obtained in 2002 to maintain its monopoly position and prevent Envipco from penetrating the Michigan market. Specifically, Tomra circumvented the bidding process at this supermarket by soliciting

an exclusive, six-year contract from the supermarket in conjunction with discounts on the installed base of Tomra RVM Systems currently in the supermarket's stores.

77. If Tomra's offer to this large Michigan supermarket chain is accepted, it would completely foreclose Envipco, and any other competitor, from competing for large supermarket chains in Michigan, causing Envipco to once again reduce its presence in that market and ensuring that no one else could enter. This would allow Tomra to maintain its monopoly in Michigan.

78. One of the large supermarket chains with stores in upstate New York and Connecticut, representing about 5% of large supermarket RVM System opportunities, has taken on responsibility for directly billing manufacturers for the amount due for redeemed containers – a function usually handled by the RVM System firm. To enable the supermarket to perform this billing function, Tomra provided the supermarket with propriety software so that its billing system could interface with Tomra's RVM System by, for example, downloading and uploading barcode information and running periodic machine activity reports. Envipco's RVM System can be easily configured to interface with Tomra's software. Tomra, however, has misrepresented to the customer that the Tomra software will not work with an Envipco RVM. Due to its concerns about the compatibility of Envipco's RVM System with Tomra's software, the customer has refused to deal with Envipco.

79. Tomra has also employed misleading and deceptive billing practices to disguise the true cost of the Tomra RVM System and mislead customers into believing that Envipco's RVM System is more costly than Tomra's RVM System. Tomra does this by combining the price it charges the retailer for the use of the Tomra RVM System with the statutory handling fee that the retailer is owed by the manufacturer.

17

80. Several bottle bill states, including Connecticut, New York, and Massachusetts, require the beverage manufacturer to pay the retailer a handling fee for each of the manufacturer's containers that the retailer redeems. This handling fee is periodically increased. In New York, for example, the legislature recently increased the handling fee from 2 cents to 3.5 cents.

81. The RVM System firm serves as an intermediary between the retailer and manufacturer. Where the RVM System firm has leased its RVM to the retailer, its invoices include not only the payment the retailer owes it, but also the handling fee that the manufacturer owes the retailer.

82. On net, the use of a RVM System by a retailer typically results in positive cash flow for the retailer. The reason for this is that the price of the RVM System is typically less than the statutory handling fee the retailer receives from the beverage manufacturer.

83. Envipco's invoices clearly indicate the payment owed to Envipco for its RVM System and the handling fee due to the retailer from the beverage manufacturer. The invoices then show how much, on net, the retailer is owed once the payment to Envipco is subtracted from the handling fee. Tomra, by comparison, does not separate out the payment it is owed from the handling fee owed by the manufacturer. Instead, Tomra provides a total amount due to the customer.

84. When a state such as New York raises the handling fee, Tomra can, and has, raised the price of its product by a portion of the handling fee increase. Moreover, Tomra does this without alerting the affected retailers. For example, when New York increased the handling fee by 1.5 cents (from 2 cents to 3.5 cents), Tomra raised its price to the retailer by .75 cents per container. Because Tomra increased its price by an amount less than the handling fee increase, its customers continued receiving a net payment from Tomra and, in fact, the customers' payments

18

increased. The increase, however, was less then it would have been had Tomra not increased its price at the same time the handling fee increased.

85. Tomra's billing practices have confused customers and caused them to believe that Tomra's prices are lower than Envipco's prices when, in fact, Envipco's prices are often more favorable.

86. Tomra's use of exclusive, long term contracts with large and important purchasers of RVM Systems, in addition to its other anticompetitive activities such as its deceptive billing practices, are unreasonable, unfair and anticompetitive because they foreclose a substantial share of the market, precluding competitors such as Envipco from an opportunity to compete on the merits.

87. Tomra's anticompetitive, unfair and deceptive practices, including its proposed acquisition of CBSI, evidence Tomra's intent to monopolize the RVM Systems market. In particular, Tomra's efforts to acquire CBSI, an actual competitor in Oregon and Michigan and a potential competitor in the rest of the United States, evidences Tomra's overall scheme to monopolize and attempt to monopolize the RVM System market in the United States and in each of the bottle bill states, including Connecticut, New York, Massachusetts and Michigan.

88. Because Tomra has monopoly power in the relevant markets and has foreclosed competitors from competing for a substantial share of the market, unless Tomra is enjoined from enforcing its anticompetitive contracts and entering into additional anticompetitive contracts, Envipco is likely to be driven out of the RVM Systems market in the United States, including the states of Connecticut, New York, Michigan and Massachusetts, leaving Tomra with a monopoly in each of the relevant markets. Once Envipco exits the market, there will be no effective constraint on Tomra's ability to raise prices.

89. Tomra's exclusionary conduct in the United States is part of a broader corporate strategy to employ anticompetitive means to obtain and maintain monopoly power in the countries where it competes. Tomra Systems ASA, and Tomra's European affiliates (collectively "Tomra Europe") engaged in the same or similar conduct alleged herein in the European Union ("EU"). As a result, Tomra Europe was found guilty by the European Commission of abusing its dominant position in violation of the antitrust laws.

90. Specifically, Tomra Europe was found to have violated the EU's antitrust laws by preserving its dominance and market share by, among other things, "preventing new operators gaining market entry, keeping competitors small by limiting their growth possibilities and weakening and eliminating competitors by way of acquisition and other methods." Judgment of the General Court (Fifth Chamber) (Sept 9, 2010), ¶ 11. The anticompetitive strategies employed by Tomra Europe were similar to the conduct of Tomra in the United States and included entering into exclusivity contracts and offering retroactive rebates to several supermarket chains.

91. As a penalty for Tomra Europe's serious and deliberate violation of EU antitrust law, the company was fined EUR 24 million, which was the highest fine, as a percentage of worldwide turnover, ever levied against a company for violating the EU's competition rules. The magnitude of the fine was upheld on appeal.

## INTERSTATE COMMERCE

92. Tomra markets and sells its RVM Systems in interstate commerce. In addition, Tomra has entered into exclusive long-terms contracts with large supermarket chains that provide for Tomra to supply RVM Systems to supermarket locations across multiple states. As such, Tomra's activities, as alleged herein, are in the flow of, and substantially affect, interstate commerce.

## HARM TO COMPETITION FROM TOMRA'S ANTICOMPETITIVE CONDUCT

93. Competition has been harmed by Tomra's exclusionary, deceptive and anticompetitive conduct because, among other things:

(a) Sales of competing RVM Systems remain below the critical level necessary to pose a threat to Tomra's market power;

(b) RVM System prices will rise above the level that would exist in a competitive market;

(c) Services related to the provision of RVM Systems are below, or threaten to fall below, the level that would exist in a competitive market; and

(d) RVM System innovation is deterred.

## ENVIPCO HAS BEEN INJURED BY TOMRA'S ANTICOMPETITIVE CONDUCT

94. As a result of Tomra's anticompetitive and exclusionary conduct, Envipco has suffered substantial harm to its business and property. Specifically, Envipco has been foreclosed from competing for a substantial share of the large supermarket chain business that is essential to being an efficient competitor. As a result, Envipco has had to reduce its presence in the Michigan market and, if Tomra is not enjoined from continuing to engage in the anticompetitive, deceptive and exclusionary conduct alleged herein, Envipco may soon be forced to exit the RVM Systems market in the United States altogether, including the States of Connecticut, New York, Michigan and Massachusetts, leaving Tomra with a monopoly in the RVM Systems market.

95. If not for Tomra's anticompetitive, deceptive and exclusionary conduct, at least some of the large supermarket chains would have purchased all, or some, of their RVM Systems from Envipco, thereby enabling Envipco to obtain the economies of scale and density of pick-up, service and maintenance routes necessary to compete.

21

96. Monetary damages alone will not fully compensate Envipco for its injuries. Envipco is also entitled to injunctive relief against further anticompetitive, unfair and deceptive conduct by Tomra in order to be made whole and to prevent further injury.

## FIRST COUNT
### (Violation of Section 3 of the Clayton Act, 15 U.S.C. § 14)

97. Envipco repeats and alleges Paragraphs 1 - 96, above.

98. The market for RVM Systems is a line of commerce.

99. Tomra and Envipco's RVM Systems are commodities within the meaning of Section 3 of the Clayton Act.

100.　　Tomra has sold and/or leased RVM Systems within the United States and, specifically, within Connecticut, New York, Massachusetts and Michigan, for use in each State on the condition that the purchaser or lessee shall not use or deal in the RVM System of a competitor of Tomra.

101.　　The effect of Tomra's sales and leases has been to foreclose a substantial share of the relevant markets and thereby to substantially lessen competition or tend to create a monopoly in the market for RVM Systems in Connecticut, New York, Michigan, Massachusetts and/or the United States, in violation of Section 3 of the Clayton Act, 15 U.S.C. § 14.

102.　　As a result of Tomra's conduct, RVM System consumers have been and will continue to be injured due to the loss of RVM System competition. In addition, consumers have been and will continue to be injured through the loss of RVM System innovation and by paying inflated, non-competitive prices to Tomra and/or being forced to agree to non-competitive contract terms with Tomra.

103.　　Envipco has been and will continue to be injured as a direct, proximate and reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is

22

foreclosed from competing in the relevant market(s), which has caused Envipco to suffer and continue to suffer, injury to its business and property, including lost profits, lost good will, lost customer relations and lost business opportunities.

104.     Envipco's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Tomra's conduct unlawful.

## SECOND COUNT
### (Violation of Section 1 of the Sherman Act)

105.     Envipco repeats and alleges Paragraphs 1 - 104, above.

106.     Tomra has entered into unlawful exclusive contracts to foreclose its competitors from supplying RVM Systems, which constitute unreasonable restraints on trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

107.     Tomra's unlawful contracts have unreasonably restrained competition in the market for RVM Systems in Connecticut, New York, Michigan, Massachusetts and/or the United States. Tomra's contracts are not reasonably necessary to accomplish any pro-competitive objective.

108.     As a result of Tomra's conduct, RVM System consumers have been and will continue to be injured due to the loss of RVM System competition. In addition, consumers have been and will continue to be injured through the loss of RVM System innovation and by paying inflated, non-competitive prices to Tomra and/or being forced to agree to non-competitive contract terms with Tomra.

109.     Envipco has been and will continue to be injured as a direct, proximate and reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is foreclosed from competing in the relevant market(s), which has caused Envipco to suffer and

continue to suffer, injury to its business and property, including lost profits, lost good will, lost customer relations and lost business opportunities.

110. Envipco's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Tomra's conduct unlawful.

## THIRD COUNT
### (Unlawful Attempted Monopolization in Violation of Section 2 of the Sherman Act)

111. Envipco repeats and alleges Paragraphs 1 - 110, above.

112. Tomra holds monopoly power in the market for RVM Systems in Connecticut, New York, Michigan, Massachusetts and the United States, as evidenced by its 63 – 87 percent market share and high barriers to entry.

113. Tomra has engaged in an overall anticompetitive scheme to willfully and unlawfully acquire, enhance and maintain monopoly power in the relevant markets through, but not limited to: (i) using exclusive contracts that lock-up a substantial share of the market thereby preventing competitors from entering the market or obtaining the economies of scale and density of pick-up, service and maintenance routes necessary to compete; (ii) offering large discounts to current customers, prior to when their contracts are set to expire, to induce them to enter into multi-year extensions of their exclusive Tomra contracts; (iii) misleading a significant customer, that was considering dual sourcing its RVM System needs, about the ability of Envipco's RVM System to interact with Tomra's propriety software system; (iv) entering into anticompetitive joint ventures with beverage manufacturers that provide for Tomra to provide pick-up service of all beverage containers in upstate New York, thereby depriving competitors of the ability to compete on equal footing for customers that expect this service to be provided by their RVM System provider; (v) engaging in deceptive billing practices that mislead customers as to the true cost of Tomra's RVM System relative to Envipco's RVM System; and (vi) seeking to acquire

CBSI, which would result in the elimination of a competitor or potential competitor in the RVM System market in Connecticut, New York, Massachusetts and Michigan and would enhance Tomra's monopoly power in the United States.

114.    Tomra's actions, as described herein, when considered individually or collectively, evidence its specific intent to monopolize and harm competition in the RVM System market in Connecticut, New York, Michigan, Massachusetts and the United States.

115.    Tomra's market power in the relevant markets, coupled with other market structure and conduct evidence, including, but not limited to, the lack of competition for RVM Systems, the barriers to entry, the nature of the anticompetitive conduct alleged herein, and related economic and market factors, create a dangerous probability that, unless restrained, Tomra will succeed in obtaining a monopoly in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

116.    Tomra's anticompetitive and exclusionary conduct, as alleged herein, has eliminated competition, significantly raised costs and barriers to entry into the relevant market, and reduced customer choice, all of which has injured, and continues to injure, customers and competition.

117.    As a result of Tomra's conduct, RVM System consumers have been and will continue to be injured due to the loss of RVM System competition. In addition, consumers have been and will continue to be injured through the loss of RVM System innovation and by paying inflated, non-competitive prices to Tomra and/or being forced to agree to non-competitive contract terms with Tomra.

118.    Envipco has been and will continue to be injured as a direct, proximate and reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is

foreclosed from competing in the relevant market(s), which has caused Envipco to suffer and continue to suffer, injury to its business and property, including lost profits, lost good will, lost customer relations and lost business opportunities.

119.    Envipco's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Tomra's conduct unlawful.

## FOURTH COUNT
### (Unlawful Monopolization in Violation of Section 2 of the Sherman Act)

120.    Envipco repeats and alleges Paragraphs 1 - 119, above.

121.    Tomra has willfully engaged in a course of conduct described herein, including anticompetitive and exclusionary actions, to acquire and maintain a monopoly in the market for RVM Systems in Connecticut, New York, Michigan, Massachusetts and the United States in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

122.    Tomra holds monopoly power in the market for RVM Systems in Connecticut, New York, Michigan, Massachusetts and the United States, as evidenced by its 63 – 87 percent market share and high barriers to entry.

123.    Tomra has the power to control prices and/or exclude competition in, or prevent entry into, the relevant markets.

124.    Tomra willfully acquired and maintained its monopoly power in the relevant markets through anticompetitive and exclusionary means, and not as a consequence of a superior product, business acumen or historic accident.

125.    As a result of Tomra's conduct, RVM System consumers have been and will continue to be injured due to the loss of RVM System competition.  In addition, consumers have been and will continue to be injured through the loss of RVM System innovation and by paying

inflated, non-competitive prices to Tomra and/or being forced to agree to non-competitive contract terms with Tomra.

126.    Envipco has been and will continue to be injured as a direct, proximate and reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is foreclosed from competing in the relevant market(s), which has caused Envipco to suffer and continue to suffer, injury to its business and property, including lost profits, lost good will, lost customer relations and lost business opportunities.

127.    Envipco's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Tomra's conduct unlawful.

## FIFTH COUNT
### (Unfair Trade Practices in Violation of the Connecticut Unfair Trade Practices Act)

128.    Plaintiff repeats and alleges paragraphs 1 - 127, above.

129.    Tomra is engaged in the trade or commerce of selling or leasing RVM Systems to customers in Connecticut.

130.    Through its conduct alleged herein, Tomra has willfully and in bad faith engaged in unfair methods of competition and unfair or deceptive trade practices in violation of the Connecticut Unfair Trade Practices Act ("CUTPA"), Conn. Gen. Stat. § 42-110b.

131.    Tomra's unfair conduct includes, but is not limited to: (i) using exclusive contracts that lock-up a substantial share of the market thereby preventing competitors from entering the market or obtaining the economies of scale and density of pick-up, service and maintenance routes necessary to compete in Connecticut; (ii) offering large discounts to current customers, prior to when their contracts are set to expire, to induce them to enter into multi-year extensions of their exclusive Tomra contracts; (iii) misleading a significant customer, that was considering dual sourcing its RVM System needs, about the ability of Envipco's RVM System to

interact with Tomra's propriety software system; (iv) engaging in deceptive billing practices that mislead customers as to the true cost of Tomra's RVM System relative to Envipco's RVM System; and (v) seeking to acquire CBSI, which would result in the elimination of a potential competitor in the RVM System market in Connecticut and would enhance Tomra's monopoly power in the United States.

132.       Tomra's unfair acts and practices are immoral, unethical, oppressive, or unscrupulous and violate the public policy of the State of Connecticut, including, but not limited to, the public policy against attempting to attain a monopoly or maintaining a monopoly through anticompetitive and exclusionary means and the policy against deceptive billing practices.

133.       Tomra's acts and practices have directly and proximately caused substantial injury to consumers of RVM Systems in the State of Connecticut and will continue to cause substantial injury to consumers in Connecticut through the loss of RVM System competition. In addition, consumers have been and will continue to be injured through the loss of RVM System innovation and by paying inflated, non-competitive prices to Tomra and/or being forced to agree to non-competitive contract terms with Tomra.

134.       Tomra knew or should have known that its conduct violated Conn. Gen. Stat. § 42-110b.

135.       Envipco has been and will continue to be injured as a direct, proximate and reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is foreclosed from competing in the relevant market(s), which has caused Envipco to suffer and continue to suffer, injury to its business and property in Connecticut, including lost profits, lost good will, lost customer relations and lost business opportunities.

28

## SIXTH COUNT
### (Violation of Connecticut Antitrust Act)

136.     Plaintiff repeats and alleges paragraphs 1 - 135, above.

137.     By reason of the foregoing, Tomra has entered into exclusive contracts to foreclose its competitors from supplying RVM Systems in Connecticut, which constitute unreasonable restraints on trade in violation of Conn. Gen. Stat. § 35-26.

138.     By virtue of its 77% market share in Connecticut and the high barriers to entry in the RVM Systems market, Tomra has monopoly power and the ability to exercise control over prices of RVM Systems in Connecticut.

139.     Tomra has willfully acquired and maintained its monopoly position in the RVM Systems market through the use of anticompetitive, exclusionary and deceptive practices, as described herein, in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-27.

140.     Tomra has acted with the specific intent of monopolizing the RVM Systems market in Connecticut, and there is a dangerous probability that, unless restrained, it will succeed in its attempt to monopolize that market in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-27.

141.     Tomra's unlawful exclusionary contracts were entered into with the purpose and effect of causing RVM System customers in Connecticut to refuse to deal with Envipco, in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-28(d).

142.     Tomra has sold and/or leased RVM Systems in Connecticut on the condition that the purchaser or lessee shall not use or deal in the RVM Systems of a competitor of Tomra.

143.     The effect of Tomra's sales and leases has been to substantially lessen competition or tend to create a monopoly in the market for RVM Systems in Connecticut, in violation of the Connecticut Antitrust Act, Conn. Gen. Stat. § 35-29.

144.     Tomra's acts and practices have directly and proximately caused substantial

injury to consumers of RVM Systems in the State of Connecticut and will continue to cause

substantial injury to consumers in Connecticut through the loss of RVM System competition.  In

addition, consumers have been and will continue to be injured through the loss of RVM System

innovation and by paying inflated, non-competitive prices to Tomra and/or being forced to agree

to non-competitive contract terms with Tomra.

145.     Envipco has been and will continue to be injured as a direct, proximate and

reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is

foreclosed from competing in the RVM System market in Connecticut, which has caused

Envipco to suffer and continue to suffer, injury to its business and property, including lost

profits, lost good will, lost customer relations and lost business opportunities.

146.     Envipco's injuries are of the type the antitrust laws were designed to prevent and

flow from that which makes Tomra's conduct unlawful.

## SEVENTH COUNT
### (Unfair or Deceptive Acts or Practices in Violation of M.G.L. c. 93A, § 2)

147.     Plaintiff repeats and alleges paragraphs 1 - 146, above.

148.     Plaintiff and Defendants are engaged in trade or commerce.

149.     Through the conduct described herein, Defendants engaged in unfair, deceptive

and anticompetitive acts and practices in Massachusetts, in violation of M.G.L. c. 93A, § 2(a).

Plaintiff brings this claim pursuant to M.G.L. c. 93A, § 11.

150.     Defendants' unfair and deceptive acts and practices include, but are not limited to:

(i) using exclusive contracts that lock-up a substantial share of the market thereby preventing

competitors from entering the market or obtaining the economies of scale and density of pick-up,

service and maintenance routes necessary to compete in Massachusetts; (ii) offering large

30

discounts to current customers, prior to when their contracts are set to expire, to induce them to enter into multi-year extensions of their exclusive Tomra contracts; (iii) engaging in deceptive billing practices that mislead customers as to the true cost of Tomra's RVM System relative to Envipco's RVM System; and (iv) seeking to acquire CBSI, which would result in the elimination of a potential competitor in the RVM System market in Massachusetts and would enhance Tomra's monopoly power in the United States.

151.    Tomra's unfair methods of competition and unfair or deceptive acts or practices have directly and proximately caused substantial injury to competition and to consumers of RVM Systems in the State of Massachusetts and will continue to cause substantial injury to competition and consumers in Massachusetts through the loss of RVM System competition. In addition, consumers have been and will continue to be injured through the loss of RVM System innovation and by paying inflated, non-competitive prices to Tomra and/or being forced to agree to non-competitive contract terms with Tomra. The acts and practices directed at Massachusetts consumers occurred primarily and substantially within the Commonwealth of Massachusetts.

152.    Defendants willfully and knowingly committed acts that were unfair or deceptive in violation of M.G.L. c. 93A, § 2(a).

153.    Envipco has been and will continue to be injured as a direct, proximate and reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is foreclosed from competing in the RVM System market in Massachusetts, which has caused Envipco to suffer and continue to suffer, injury to its business and property, including lost profits, lost good will, lost customer relations and lost business opportunities.

## EIGHTH COUNT
### (Violation of Massachusetts Antitrust Law)

154.    Plaintiff repeats and alleges paragraphs 1 - 153, above.

155.     By reason of the foregoing, Tomra has entered into unlawful contracts to foreclose its competitors from supplying RVM Systems in Massachusetts, which constitute unreasonable restraints on trade in violation of M.G.L. c. 93, § 4.

156.     By virtue of its 63% market share in Massachusetts and high barriers to entry in the RVM Systems market, Tomra has monopoly power and the ability to exercise control over prices of RVM Systems in Massachusetts.

157.     Tomra has willfully acquired and maintained its monopoly position in the RVM Systems market through the use of anticompetitive, exclusionary and deceptive practices as described herein, in violation of the Massachusetts Antitrust Act, M.G.L. c. 93, § 5.

158.     Tomra has acted with the specific intent of monopolizing the RVM Systems market in Massachusetts, and there is a dangerous probability that, unless restrained, it will succeed in its attempt to monopolize that market in violation of the Massachusetts Antitrust Act, M.G.L. c. 93, § 5.

159.     Tomra has sold and/or leased RVM Systems in Massachusetts on the condition that the purchaser or lessee shall not use or deal in the RVM System of a competitor of Tomra.

160.     The effect of Tomra's sales and leases has been to substantially lessen competition or tend to create a monopoly in the market for RVM Systems in Massachusetts, in violation of the Massachusetts Antitrust Act, M.G.L. c. 93, § 6.

161.     Tomra's acts and practices have directly and proximately caused substantial injury to consumers of RVM Systems in the Commonwealth of Massachusetts and will continue to cause substantial injury to consumers in Massachusetts through the loss of RVM System competition. In addition, consumers have been and will continue to be injured through the loss of RVM System innovation and by paying inflated, non-competitive prices to Tomra and/or

being forced to agree to non-competitive contract terms with Tomra.  The acts and practices

directed at Massachusetts consumers occurred primarily and substantially within the

Commonwealth of Massachusetts.

162.     Envipco has been and will continue to be injured as a direct, proximate and

reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is

foreclosed from competing in the RVM System market in Massachusetts, which has caused

Envipco to suffer and continue to suffer, injury to its business and property, including lost

profits, lost good will, lost customer relations and lost business opportunities.

163.     Envipco's injuries are of the type the antitrust laws were designed to prevent and

flow from that which makes Tomra's conduct unlawful.

## NINTH COUNT
### (Violation of N.Y. Gen. Bus. Law § 340)

164.     Plaintiff repeats and alleges paragraphs 1 - 163, above.

165.     By virtue of its 76% market share in New York and high barriers to entry in the

RVM Systems market, Tomra has monopoly power and the ability to exercise control over prices

of RVM Systems in New York.

166.     Tomra, as described herein, has entered into unreasonable and exclusive

agreements with retailer that purchase or lease RVM Systems in New York.

167.     In addition, Tomra, as described herein, has entered into unreasonable agreements

with the beverage manufacturers in upstate New York to control the pick-up of used containers

from retail outlets in that area.

168.     The agreements with retailers and the agreements with the beverage

manufacturers constitute contracts, agreements, arrangements and/or combinations that have

unreasonably restrained competition in the RVM System market in New York, in violation of
N.Y. Gen. Bus. Law § 340.

169.     Tomra's unlawful agreements were entered into with the intent and effect of
causing RVM System customers in New York to refuse to deal with a competitor of Tomra in
New York.

170.     The effect of Tomra's agreements has been to substantially lessen competition or
tend to create a monopoly in the market for RVM Systems in New York.

171.     Tomra's acts and practices have directly and proximately caused substantial
injury to consumers of RVM Systems in the State of New York and will continue to cause
substantial injury to consumers in New York through the loss of RVM System competition. In
addition, consumers have been and will continue to be injured through the loss of RVM System
innovation and by paying inflated, non-competitive prices to Tomra and/or being forced to agree
to non-competitive contract terms with Tomra.

172.     Envipco has been and will continue to be injured as a direct, proximate and
reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is
foreclosed from competing in the RVM System market in New York, which has caused Envipco
to suffer and continue to suffer, injury to its business and property, including lost profits, lost
good will, lost customer relations and lost business opportunities.

173.     Envipco's injuries are of the type the antitrust laws were designed to prevent and
flow from that which makes Tomra's conduct unlawful.

## TENTH COUNT
### (Violation of Michigan Antitrust Law)

174.     Plaintiff repeats and alleges paragraphs 1 - 173, above.

34

175.     By reason of the foregoing, Tomra has entered into unlawful contracts to foreclose its competitors from supplying RVM Systems in Michigan, which constitute unreasonable restraints on trade in violation of Michigan's Antitrust Reform Act, MCLS § 445.772.

176.     By virtue of its 87% market share in Michigan and high barriers to entry in the RVM System market, Tomra has monopoly power and the ability to exercise control over prices of RVM Systems in Michigan.

177.     Tomra has sold and/or leased RVM Systems in Michigan on the condition that the purchaser or lessee shall not use or deal in the RVM System of a competitor of Tomra.

178.     The effect of Tomra's sales and leases has been to substantially lessen competition or tend to create a monopoly in the market for RVM Systems in Michigan.

179.     Tomra has willfully established and maintained its monopoly position in the RVM Systems market through the use of anticompetitive practices and exclusionary conduct, as described herein, and for the purpose of excluding and limiting competition, in violation of the Michigan Antitrust Reform Act, MCLS § 445.773.

180.     Tomra has acted with the specific intent of monopolizing the RVM System market for the purpose of excluding and limiting competition, and there is a dangerous probability that, unless restrained, it will succeed in its attempt to establish a monopoly in that market in violation of the Michigan Antitrust Reform Act, MCLS § 445.773.

181.     Tomra's acts and practices have directly and proximately caused substantial injury to consumers of RVM Systems in the State of Michigan and will continue to cause substantial injury to consumers in Michigan through the loss of RVM System competition. In addition, consumers have been and will continue to be injured through the loss of RVM System

35

innovation and by paying inflated, non-competitive prices to Tomra and/or being forced to agree to non-competitive contract terms with Tomra.

182. Envipco has been and will continue to be injured as a direct, proximate and reasonably foreseeable result of Tomra's anticompetitive and exclusionary conduct because it is foreclosed from competing in the RVM System market in Michigan, which has caused Envipco to suffer and continue to suffer, injury to its business and property, including lost profits, lost good will, lost customer relations and lost business opportunities.

183. Envipco's injuries are of the type the antitrust laws were designed to prevent and flow from that which makes Tomra's conduct unlawful.

## JURY DEMAND

Plaintiff requests a trial by jury on all triable issues alleged in this Complaint.

## RELIEF SOUGHT

WHEREFORE, Plaintiff respectfully requests that this Court:

      i)      Adjudge and declare that Defendants' conduct is in violation of the antitrust and other laws alleged in this Complaint;

      ii)     Award Plaintiff trebled damages for its injuries that were proximately caused by Defendants' violation of the antitrust laws of the United States and the laws of the States of Connecticut, New York, Massachusetts, and Michigan;

      iii)    Award Plaintiff actual and punitive damages proximately caused by Defendants' conduct in violation of federal and state laws;

      iv)    Enjoin the Defendants from: (i) entering into long-term exclusive contracts with RVM System customers; (ii) inducing customers to prematurely renew

their exclusive Tomra contracts, thereby depriving competitors of the opportunity to compete for the customer's account; (iii) offering rebates to current customers conditioned on their agreement to retain Tomra as their RVM System provider; (iv) entering into or enforcing agreements with beverage manufacturers whereby Tomra is the only firm approved to provide pick-up service to RVM System consumers; and (v) engaging in deceptive and misleading billing practices.

v)     Permanently enjoin Defendants from engaging in anti-competitive and exclusionary conduct as provided for in 15 U.S.C. § 26, and state laws.

vi)    Award Plaintiff costs of the suit and reasonable attorneys' fees as provided for in 15 U.S.C. § 15, and state laws;

vii)   Provide such other and further relief to which Plaintiff may be justly entitled.

Dated: November 4, 2010                      Axinn, Veltrop & Harkrider LLP

By: _Michelle Seagull_

Michelle H. Seagull
William M. Rubenstein
John M. Tanski
90 State House Square
Hartford, CT 06103
mhs@avhlaw.com
860-275-8100

Attorneys for Plaintiff
Environmental Products Corp.